**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WESTPORT INSURANCE CORPORTION, AS SUCCESSOR-IN-INTEREST TO COREGIS INSURANCE COMPANY<br><br>Plaintiff<br><br>v.<br><br>BOARD OF EDUCATION OF J. STERLING MORTAN HIGH SCHOOL DISTRICT #201, HECTOR GARCIA, MANUEL ISQUIERDO, and JOHN DOE<br><br>Defendant | Case No. 25-cv-04185<br><br>Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Westport Insurance Corporation, as Successor-in-Interest to Coregis Insurance Company ("Westport"), seeks a declaratory judgment against the Board of Education of J. Sterling Morton High School District # 201 (the "District"), Hector Garcia, Manuel Isquierdo, and John Doe. Westport brings this action to resolve a controversy regarding the parties' rights and duties under primary and umbrella insurance policies issued from 1998 to 2000 by Westport's predecessor, Coregis Insurance Company ("Coregis"). Westport and the District bring cross motions for partial judgment on the pleadings with respect to their rights under the primary

policies.[1] For the reasons stated herein, Westport's motion is denied and the District's motion is granted in part and denied in part.

## I. Background

Coregis issued primary insurance policies to the District for annual periods from August 15, 1998 to August 15, 2000. [21-1] at ¶ 4. The primary policies provided liability coverage with an annual limit of $1 million for each "occurrence." *Id.* at ¶ 55. Under the policies, Coregis agreed to "pay those sums that the [District became] legally obligated to pay as 'damages' because of 'bodily injury' . . . caused by an 'occurrence.'" *Id.* at ¶ 56. "Bodily injury" is defined under the policies as including "bodily injury, sickness, disease, disability, shock, mental anguish, mental injury and humiliation, sustained by a person, including death resulting from any of these at any time." *Id.* An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* The policies also provided coverage for "sums that the [District became] legally obligated to pay as 'damages' because of 'personal injury.'" [22] at ¶ 98.[2] "'Personal injury' means injury arising out of one or more of the following offenses," including, but not limited to, "[m]ental [a]nguish, mental injury and humiliation." *Id.* at ¶ 102.

The policies contained an "Expected or Intended Injury" exclusion, which stated: "This insurance does not apply to . . . '[b]odily injury,' . . . or 'personal injury'

---

[1] Copies of the umbrella policies have not been located. [21-1] at ¶ 4. As such, any potential coverage under the umbrella policies is not at issue in these motions.
[2] Unless otherwise noted, citations are to the original complaint [21-1] or the counterclaim paragraphs of the District's answer and counterclaim. [22] at ¶¶ 1-181.

arising, in whole or in part, from any dishonest, fraudulent or criminal act of any insured." [21-1] at ¶ 56. The policies further provide that the insurer must be "notified as soon as practicable of an 'occurrence' or an offense which may result in a claim," and "immediately notif[ied] of any 'occurrence,' claim or 'suit' that involves . . . [r]ape and/or serious physical assault." *Id.*

In 2022, John Doe, a former student at Morton East High School ("MEHS"), sued the District, former Vice Principal Hector Garcia, former Principal Manuel Isquierdo, and music teacher Jane Reynolds. [21-1] at ¶¶ 10-11, 18-19. Doe alleged that Garcia, Isquierdo, and the District failed to prevent and report sexual abuse perpetrated by Reynolds while Doe was a student. *Id.* at ¶2. Westport was notified about the lawsuit and agreed to retain defense counsel chosen by the District subject to a complete reservation of rights under the primary policies. *Id.* at ¶ 70. Reynolds settled with Doe and the case proceeded to trial with respect to the remaining defendants. [22] at ¶ 78.

The following facts derived from the underlying lawsuit are not in dispute. Doe was a freshman at MEHS in August 1998. [21-1] at ¶ 19. In August 1999, during his sophomore year, Doe enrolled in Reynolds' music class. *Id.* at ¶ 20. At some point during either his freshman or sophomore year, Doe also joined Reynolds' piano club. *Id.* Doe's complaint alleged that, beginning in December 1998 and continuing through May 2000, Reynolds sexually assaulted Doe in her vehicle and at her home. [22] at ¶ 32. At some point, Doe's mother met with Garcia and Isquierdo and told them that she was "highly concerned" about Reynolds "behavior" toward Doe, and that "she had

observed Doe and Reynolds making intimate physical contact." *Id.* at ¶¶ 33-34. Doe alleged his mother told Garcia and Isquierdo that she believed Doe's relationship with Reynolds was "improper" and sexual in nature. *Id.* at ¶¶ 35-36.

Isquierdo testified that he met with Reynolds and a union official on April 14, 2000, and asked if she had engaged in any improper behavior towards Doe during school hours. [21-1] at ¶ 25. According to Isquierdo, Reynolds denied having an inappropriate relationship with Doe, and Isquierdo "took her word at face value." *Id.* Isquierdo asked Reynolds to meet again on May 23, 2000, after Doe's mother made another complaint, but the meeting was promptly ended because Reynolds brought counsel and no lawyer for the District was present. *Id.* at ¶ 30.

Reynolds, on the advice of counsel, sent a letter to Isquierdo and other administrators to memorialize the meeting. *Id.* at ¶ 32. In the letter, Reynolds said she told Isquierdo during the meeting that Doe called her home a few days earlier and told her his father was beating him, so she reported the alleged abuse to the police. *Id.* at ¶ 33. The letter also advised Isquierdo that after the meeting Doe came to her home and told her that several family members were physically and sexually abusing him. *Id.* at ¶ 34. Reynolds apparently took Doe to the hospital and alerted the Department of Children and Family Services ("DCFS"). *Id.* According to further testimony, Reynolds was reprimanded in writing by the assistant superintendent for calling DCFS without notifying the District, as the allegations of family abuse involved a "very sensitive situation for which [she] had not been trained." *Id.* at ¶ 35.

Isquierdo, who was copied on the letter from the superintendent, did not direct anyone to call DCFS about Doe's mother's reports against Reynolds. *Id.* at ¶¶ 36-37.

Ultimately, Doe alleged the District and its agents knew, or should have known, that his relationship with Reynolds was improper and that he was the victim of multiple sexual assaults by Reynolds between 1998 to 2000. [22] at ¶¶ 38-39. On March 11, 2025, the jury returned a $15 million dollar verdict against the District, including $6.43 million for past loss of a normal life, $4.29 million for past emotional distress, $1.71 million for loss of a normal life in the future, and $2.57 million for future emotional distress. [21-1] at ¶ 52. On March 25, 2025, the District demanded that Westport pay indemnity of $2 million under the 1998-2000 primary policies. *Id.* at ¶5. Westport refused to indemnify the District under the 1998-1999 and 1999-2000 primary policies and filed this suit seeking a declaration that it has no duty to indemnify the District for the underlying lawsuit. [22] at ¶ 9.

Westport filed a motion for partial judgment on the pleadings seeking judgment in its favor on Counts II, III, and IV of the complaint. [42] at 1. The District also filed a motion for partial judgment on the pleadings as to Counts I and II of its counterclaim.[3] [29] at 2.

## II. Standard

[3] Collective Liability Insurance Cooperative ("CLIC"), as subrogee of the District, additionally sought judgment on Count IV of the counterclaim. [29] at 2. However, the District has since filed an amended counterclaim withdrawing Count IV. [72] at 5; [75]. The District's motion [29] is denied as moot as to Count IV.

Under Rule 12(c), a party can move for judgment on the pleadings after the filing of the complaint and answer. *Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715, 718 (7th Cir. 2002). Only when it appears beyond a doubt that the non-moving party cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved will a court grant a Rule 12(c) motion. *Moss v. Martin*, 473 F.3d 694, 698 (7th Cir. 2007). A court may consider the complaint, the answer, and any written instruments attached as exhibits. *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 312-13 (7th Cir. 2020).

"The only difference between a motion for judgment on the pleadings and a motion to dismiss is timing; the standard is the same." *Federated Mut. Ins. Co.,* 983 F.3d at 313. All well-pleaded allegations in the non-movant's pleadings must be taken as true, and all facts and reasonable inferences from those facts must be construed in the light most favorable to the non-movant. *Mesa Lab'ys, Inc. v. Fed. Ins. Co.*, 994 F.3d 865, 867 (7th Cir. 2021).

## III. Analysis

Westport seeks judgment on the pleadings with respect to three counts in the complaint. Count II of the complaint alleges Westport has no duty to indemnify the District for the judgment against it under the 1998-1999 or 1999-2000 policy periods because the District "was not held liable to pay any damages for 'bodily injury' caused by an 'occurrence' or 'accident,'" as defined by the policies. [21-1] at ¶ 95. Count III of the complaint alleges Westport has no duty to indemnify the District under any policy

because the District failed to give timely notice. *Id.* at ¶¶ 110-11. Finally, Count IV of the complaint alleges Westport has no duty to indemnify the District under the 1998-1999 policy because there was no "bodily injury" during the policy period. *Id.* at ¶ 117.

The District, in its motion, seeks judgment in its favor with respect to those three counts in the complaint, as well as two counts in its counterclaim. Count I of the District's counterclaim alleges Westport owes a duty to indemnify under both the 1998-1999 and 1999-2000 policy periods where the underlying lawsuit alleged Doe suffered "bodily injury" during the policies' effective dates, and no exclusion precludes coverage. [22] at ¶¶ 127, 137. Count II of the District's counterclaim alleges Westport owes a duty to indemnify under both primary policies where the underlying lawsuit also alleged Doe suffered "personal injury" as defined in the policies, and no exclusion precludes coverage. *Id.* at ¶¶ 144-51. The Court's ruling as to each claim is set forth below.

**1. Count II of the Complaint**

Westport alleges it has no duty to indemnify under the 1998-1999 or 1999-2000 primary policies because the District was not held liable to pay any damages for "bodily injury" caused by an "occurrence," as defined in the policies. [21-1] at ¶ 95. As described above, the policies provide coverage for damages for bodily injury "caused by an 'occurrence.'" *Id.* at ¶ 56. The policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* The policies also include an "Expected or Intended Injury" exclusion.

*Id.* Westport argues the District "was held liable for excluded 'bodily injury' resulting from its 'willful and wanton' acts," not for "an accident." *Id.* at ¶ 96.

The District, by contrast, argues Doe's injuries were the result of an "occurrence" under the policies where its liability in the underlying lawsuit was "based on negligently supervising, hiring and retaining Reynolds, and failing to make a report to DCFS as a mandatory reporter." [47] at 10-11. The District notes there is no dispute of fact that the underlying lawsuit did not allege that the District "expected or intended" for any sexual abuse to occur. *Id.* at 11. As such, according to the District, its conduct—even if willful or wanton—was "accidental in nature and an 'occurrence' as defined" in the primary policies. *Id.*

"Illinois courts have focused on whether the injury is expected in determining whether an occurrence is an 'accident.'" *American Family Mut. Ins. Co. v. Enright*, 781 N.E.2d 394, 398 (Ill. App. Ct. 2002); *see also Calvert Ins. Co. v. Western Ins. Co.*, 874 F.2d 396, 399 (7th Cir. 1989) ("[t]he focus at all times, under Illinois law, is whether the injury was expected or intended by the [insured], not whether the acts of the [insured] were performed intentionally"). "[T]herefore, if an injury is not expected or intended by the insured, it is considered an accident." *Enright*, 781 N.E.2d at 398 (finding underlying claim was an "occurrence" where no allegations in the underlying complaint alleged that the insured intended to cause injury). Here, the underlying complaint does not allege that the District intended to cause Doe injury. [21-2] at 12-17.

However, Westport relies on *Calvert Ins. Co.*, 874 F.2d at 399, to argue that even absent intentional injury, an injury can be deemed "expected" where the damages are "of such a nature that they should have been *reasonably anticipated* (expected) by the insured." (emphasis in original); [43] at 21. The policy at issue in *Calvert* defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Calvert Ins. Co.*, 874 F.2d at 398. There, the underlying complaint alleged that the insured city had knowledge of ten prior instances of constitutional violations by its police officers, and "with deliberate indifference and reckless disregard for the civil rights of its citizens" failed to "supervise, train, and control the [o]fficers" who assaulted the underlying plaintiff. *Id.* at 400. The Court found "where a [c]ity recklessly fails to train or supervise its officers and where it recklessly fails to act even though it is aware of a series of civil rights violations against its citizens, the [c]ity 'expects' that injuries such as those suffered by [the underlying plaintiff] will occur." *Id.* at 401.

The District argues that *Calvert* is distinguishable from this case. [48] 11-12. The Court agrees. The reasoning set forth in *Calvert* to conclude the city could have reasonably expected the underlying plaintiff's injuries is not applicable here. There, the city was on notice of a series of constitutional violations by its officers. Here, there were no allegations that the District was aware of any prior instances of misconduct involving Reynolds such that it could have reasonably expected Doe's injuries. As such, the general standard for determining whether an injury is caused by an

"occurrence" applies here. Where the underlying lawsuit did not allege the District intended or expected Doe's injuries, his claims were caused by an "occurrence" as defined in the primary policies. The District's motion for judgment as to Count II of the complaint is granted.

**2. Count III of the Complaint**

Westport alleges it has no duty to indemnify the District for damages associated with the underlying lawsuit because the District failed to comply with both primary policies' notice requirements. [21-1] at ¶¶ 110-11. The primary policies required the insurer be "notified as soon as practicable of an 'occurrence' or an offense which may result in a claim," and "immediately notif[ied] of any 'occurrence,' claim or 'suit' that involves . . . [r]ape and/or serious physical assault." *Id.* at ¶ 56. Westport alleges, "[t]o the extent the Underlying Lawsuit involves an 'occurrence,' such 'occurrence' involved rape and/or serious physical assault or was otherwise likely to result in a claim." *Id.* at ¶ 106. Westport argues the District "was indisputably aware of Doe's mother making 'serious' allegations about a sexual relationship, 'inappropriate relationship,' and/or 'inappropriate contact' by no later" than April 2000. [43] at 20. As such, according to Westport, the notice the District provided in 2021, shortly before Doe's complaint was filed, was 20 years too late. [21-1] at ¶ 109.

The District, in its motion and in its response to Westport's motion, argues notice was timely. [30] at 30-32; [47] at 8-9. The District asserts there was no testimony at trial that the District had actual notice of a sexual relationship between Doe and Reynolds. *Id.* at 30. Isquierdo testified that he was only aware of an

allegation of an "inappropriate relationship" between Doe and Reynolds. [21-5] at 59:12-17. According to his testimony, Isquierdo questioned Reynolds about Doe's mother's complaints and Reynolds denied having an inappropriate relationship with Doe. [21-1] at ¶ 25. Isquierdo stated under oath that he "took [Reynold's] word at face value." *Id.* Reynolds later reported to Isquierdo and other school administrators that Doe was being physically and sexually abused, not by her, but by various members of his family. *Id.* at ¶¶ 33-34. Reynolds claimed to have reported that abuse to the Cicero Police Department and DCFS. *Id.* She then took Doe to the emergency room for a physical evaluation. *Id.* at ¶ 34. Reynolds was reprimanded, not for her relationship with Doe, but for overstepping her authority as a teacher and failing to properly report Doe's allegations of family abuse to the District for the proper personnel to become involved. [21-1] at ¶ 35. Accordingly, the District argues they were not required to provide notice in 2000 where "[t]he undisputed evidence at trial was that the District knew Doe had alleged he had been sexually abused by his family, not by Reynolds." [30] at 32.

"Generally, the timeliness of the notice given pursuant to a policy provision is a question of fact for the trier of fact." *University of Illinois v. Continental Cas. Co.*, 599 N.E.2d 1338, 1354 (Ill. App. 1992). "The insured need not provide notice of every possible event out of which coverage may arise, but only of claims made." *Id.* "No general rule can be promulgated as to what constitutes a reasonable time within which to give notice since this question depends upon the facts and circumstances of each particular case." *Id.* (reversing summary judgment where "reasonable persons

could draw different inferences from the uncontroverted facts" as to "whether the notice was reasonable").

Construing the facts in the light most favorable to the District—as the Court must in evaluating Westport's motion—it is plausible that the District's 2021 notice was timely under the primary policies. *See Mesa Lab'ys, Inc.,* 994 F.3d at 867 (when evaluating a motion for judgment on the pleadings, a court must "view the facts in the [pleadings] in the light most favorable to the nonmoving party"). The District has plausibly alleged that, in failing to investigate Doe's mother's allegations—conduct that formed one of the bases for the judgment against it—it did not have sufficient notice in 2000 of an "occurrence" involving "[r]ape and/or serious physical assault" or an "'occurrence' or offense which may result in a claim." [21-1] ¶ 56. Conversely, drawing reasonable inferences in favor of Westport, it is also plausible that the District had enough information in 2000 to trigger the policies' notice requirement. As such, where both the District and Westport make plausible allegations as to notice, the parties' cross motions for judgment on Count III of the complaint are denied.

**3. Count IV of the Complaint**

Westport also moves for judgment on the pleadings where it argues there are no disputed issues of material fact regarding indemnity for damages for "bodily injury" under the 1998-1999 primary policy, because "[t]he sexual abuse giving rise to Doe's claims actually began during the 1999-2000 [policy] period." [43] at 2. The District, by contrast, argues it has "met its burden to demonstrate that Doe suffered 'bodily injury' in the form of 'mental anguish, mental injury, and humiliation' during the

1998-99 [p]olicy's effective dates." [48] at 3. Where factual disputes remain, neither party is entitled to judgment with respect to coverage under the 1998-1999 primary policy.

"Bodily injury" is defined under the policies as including "bodily injury, sickness, disease, disability, shock, mental anguish, mental injury and humiliation, sustained by a person, including death resulting from any of these at any time." [21-1] ¶ 56. There is no dispute that the damages associated with Doe's sexual assault meet the definition of "bodily injury" under the policies, and that Doe was sexually assaulted by Reynolds during the 1999-2000 policy period. [30] at 18; [43] at 2. Factual disputes remain, however, as to whether Doe experienced—and, therefore, whether the District was held liable for—"bodily injury" in the form of "mental anguish, mental injury, [or] humiliation" during the 1998-1999 policy period.

The District alleges that Doe was groomed by Reynolds during the 1998-1999 school year, and therefore experienced "mental anguish, mental injury and[/or] humiliation" as a result. [22] at ¶¶ 125-26, 158. Westport denies these allegations. [26] at ¶¶ 125-26. The District alleges Reynolds began grooming Doe during the 1998-99 school year when she recruited him to join the school's piano club. [22] at ¶ 125 (District's allegations in the counterclaim); [22] at ¶ 20 (District's answer to Westport's complaint). Westport alleges in its complaint that Doe did not join the

piano club until the following year, in August 1999. [21-1] at ¶ 20; [52] at ¶ 6. Thus, the pleadings diverge as to when Doe and Reynolds began having regular contact.[4]

Factual disputes remain as to what exactly occurred during the 1998-1999 policy period. According to the District, "Reynolds' grooming of Doe during the 1998-99 policy period and Doe's resulting mental injury [was] an independent 'bodily injury' that occurred during the 1998-99 [policy]'s effective dates." [47] at 5. According to Westport, "Does's purported 'grooming' allegations are a brief segue to the abuse and resulting harms [that gave] rise to [ ] claims" that occurred during the 1999-2000 policy period. [52] at 6. Where material issues of fact remain, the parties' cross motions for judgment on Count IV of the complaint are denied. *See Moss*, 473 F.3d at 698 (only when "moving party demonstrates that there are no material issues of fact to be resolved will a court grant a Rule 12(c) motion").

**4. Count I of the Counterclaim**

The District argues it is entitled to indemnity under both the 1998-1999 and 1999-2000 policy periods where the underlying lawsuit alleged Doe suffered "bodily injury" during the policies' effective dates, and no exclusion precludes coverage. [22] at ¶¶ 127, 137. However, the District is not entitled to judgment on Count I of its counterclaim. First, as outlined above, factual disputes remain as to the 1998-1999 policy period such that neither party is entitled to judgment at this time. Second,

---

[4] Neither party attached Doe's trial testimony to their pleadings. As such, it is not considered for purposes of this motion. *See Federated Mut. Ins. Co.,* 983 F.3d at 313 (For purposes of a motion for judgment on the pleadings, a court may consider "the complaint, the answer, and any written instruments attached as exhibits.")

though there is no dispute that Doe suffered "bodily injury" during the 1999-2000 policy period, the Court cannot grant judgment in favor of the District where the question of whether the District provided timely notice is unresolved. *See Kerr v. Illinois Cent. R. Co.*, 670 N.E.2d 759, 768 (Ill. App. 1996) ("[c]ompliance with the notice provision is a condition precedent to coverage and if breached, the insurer will not be liable under the policy"). For these reasons, the District's motion for judgment on the pleadings as to Count I of the counterclaim is denied.

**5. Count II of the Counterclaim**

Finally, the District seeks a judgment that Westport owes a duty to indemnify under both primary policies where the District was held liable for Doe's "personal injury," as defined in the policies. [22] at ¶¶ 144-51. In addition to covering bodily injuries, the primary policies provided coverage for "sums that the [District became] legally obligated to pay as 'damages' because of 'personal injury.'" [22] at ¶ 98. The policies define "personal injury" as "injury arising out of one or more of the following offenses," followed by a list of offenses, including—among other things—false arrest, malicious prosecution, wrongful eviction, publication of slanderous material, wrongful entry or eviction, discrimination, and "[m]ental anguish, mental injury and humiliation." [21-11] at 839.

The District argues there is "no dispute the [u]nderlying [l]awsuit alleged 'mental anguish, mental injury, and humiliation' as Doe alleged he suffered 'severe psychological, education, and emotional injuries all of which caused him great mental and emotional distress.'" [30] at 27. As such, the District argues the damages

associated with the underlying lawsuit meet the definition of "personal injury" under the primary policies. *Id.* Westport argues the policies' definition of "personal injury" makes clear that it provides "offense-based coverage," rather than the "general harm-based coverage" provided for "bodily injury." [44] at 12. Westport further suggests "the distinction between 'offensive' conduct and resulting harm is consistently drawn in the 1998-2000 Primary Policies," and yet the District asks the Court "to ignore that distinction and drastically expand 'personal injury' coverage to include even slip and fall claims seeking damages for 'mental anguish.'" [43] at 18.

In *Continental Casualty Co. v. Canadian Universal Insurance Co.*, 924 F.2d 370 (1st Cir. 1991), the First Circuit addressed coverage under a similar personal injury provision. There, as here, the insurer provided coverage for bodily injury caused by an "occurrence," defined as "an accident . . . which results in bodily injury . . . neither expected nor intended from the standpoint of the insured." *Id.* at 373. In addition, the insurer provided coverage for "certain intentional acts" set forth in the "Personal Injury Liability" section. *Id.* The personal injury provision listed several of the same enumerated "offenses" listed in these policies—false arrest, malicious prosecution, publication of defamatory material, wrongful entry or eviction—and also included coverage for "Bodily Injury, Sickness, Disease, Disability, Shock, Mental Anguish, Mental Injury and Humiliation." *Id.*

The Court rejected the insurer's argument that the "language did not mean precisely what it said, i.e., that the policy would provide coverage for liability resulting in bodily injury, sickness, disease, disability, shock, mental anguish, mental

injury and humiliation." *Id.* at 374. Where it was unambiguous, the Court refused to "ignore the plain language that [the insurer] negotiated and agreed to include in the policy." *Id.* Where the language was clear—that damages arising from the injuries listed, when caused by the insured, would be covered under the personal injury provision—the Court found the damages awarded in the underlying action "for mental and emotional injuries" were covered by the policy. *Id.* at 375; *see also Titan Holdings Syndicate, Inc. v. Keene*, 898 F.2d 265, 270 (1st Cir. 1990) ("by adding 'mental injury, anguish or shock' and 'humiliation' to the definition of 'personal injury' [updated endorsements] seem to expand the scope of coverage for personal injury to include claims against the insured based upon the type of injury suffered").

Here, too, the language set forth in the policies' definition of "personal injury" is unambiguous. The policies provide coverage for damages associated with "personal injury" which "means injury arising out of one or more of the following offenses," including "[m]ental anguish, mental injury and humiliation." [21-11] at 839. Finding the District failed to protect Doe from sexual abuse and assault, the jury returned a $15 million dollar verdict against the District—including $4.29 million for past emotional distress and $2.57 million for future emotional distress. [21-1] at ¶ 52; *see People v. Cardamone*, 905 N.E.2d 806, 812 (Ill. 2009) ("Black's Law Dictionary defines 'mental anguish' and 'emotional distress' as synonymous phrases.") The damages associated with the underlying lawsuit fit the definition of "personal injury" provided in the primary policies.

Westport further argues, in its response to the District's motion, that even if the underlying lawsuit falls within the terms of the "personal injury" coverage, there were no damages for "mental anguish," "humiliation," or a corresponding "offense" during the 1998-1999 policy period. [44] at 15-16. As set forth above, factual disputes remain as to what occurred during the 1998-1999 policy period, and the issue of notice has yet to be resolved. For these reasons, though the Court finds in favor of the District as to the definition of "personal injury" under the policies, it denies the District's motion for judgment as to Count II of the counterclaim.

## IV. Conclusion

For the reasons stated herein, judgment is entered in favor of the District as to Count II of the complaint. All other portions of the parties' cross motions for judgment on the pleadings are denied. [29]; [42].

E N T E R:

Dated: August 28, 2026

Mary M Rowland

MARY M. ROWLAND
United States District Judge